### BOND et ux. v. FORT WORTH & R. G. RY. CO.

#### No. 7944.

Court of Civil Appeals of Texas. Austin.

May 2, 1934.

Rehearing Denied May 16, 1934.

Smith & Smith, of Anson, for appellants.

Allen & Gambill, of Fort Worth, and Mc-Cartney & McCartney, of Brownwood, for appellee.

BAUGH, Justice. '

Suit was by Bond and wife against the railway company for negligently causing the death of their minor son on August 7, 1930, by being run over by one of its passenger trains. Trial was to a jury upon special issues, but after their verdict, upon motion of appellee, the trial court rendered judgment for the railway company non obstante veredicto.

The defendant railway company, in .addition to special exceptions and general denial, pleaded contributory negligence of the deceased causing his death, and that appellants had executed on August 11, 1930, for a consideration of $250 a release of the railway company from all liability for such death. To this release the appellants pleaded that it was procured by overreaching, fraud, and deceit of appellee's claim agent. The jury found that the deceased's death was caused by the negligence of the operatives of the train in failing to discover the deceased's perilous position on or near its track in time to avoid striking him, that W. J. Bond, when he signed the release, did not understand that it was a release of the railway company from all liability, and that the claim agent misled or deceived him as to the contents and nature of the release.

In his findings of fact in support of his judgment non obstante veredicto, the trial court found that the deceased was guilty of contributory negligence as a matter of law, and that the appellants were both persons of intelligence who could read, that, had they read the release, they would have known its terms, and that, if they did not do so, their failure so to do was not caused by any fraud of the claim agent.

Since we have concluded that there was no evidence of fraud, deceit, or overreaching in the execution of the release, and that it was binding upon appellants and barred their recovery in any event, we find it unnecessary to discuss the issues of negligence.

The following facts appear: The deceased, a boy 17 years of age, left his brother's home in Brownwood about 8 o'clock on the night of August 6th, to go to the home of his parents in Comanche county. Indications were that he had walked eastward upon the railroad track to a public road crossing thereof about three miles east of Brownwood. He was struck there by a west-bound passenger train shortly after sunrise next morning at a point between the used portion of the public road and the cattle guard over the track on the west side of the public road right of way. While not essential to the issue upon which we have concluded that the case must be affirmed, every indication was that, while waiting there to catch a ride on the highway, he had gone to sleep upon or near the track. After his death his body was removed to a funeral home in Brownwood and his parents notified. Upon their arrival and in making the arrangements for the funeral, they advised the undertaker that they were not able to pay the funeral expenses. The claim agent of the railway company thereupon authorized expenses for deceased's burial, and W. J. Bond selected a casket. The body was taken to his home in Comanche county and interred the following day.

On August 11th, the claim agent and the undertaker went to the home of appellants in Comanche county, apparently at the instance of the undertaker, for the purposes of settlement. It is not contended that the railway company admitted liability for the son's death, and Bond admitted that he was responsible for the funeral expenses. Upon their arrival, Bond testified that the claim agent said, "I come over to make out a release." The release in question was prepared on the typewriter there at his home. It is clear and unambiguous and released the railway company from all liability. Voucher was issued at the time for $250, payable to Bond, and recited release of the railway company of all liability. He indorsed it to the under-

taker, who thereupon gave Bond his personal check for $40. The funeral expenses were $200, and $10 charged for making the trip from Brownwood. The remaining $40 was paid for a tombstone at the son's grave and for incidental expenses of Bond in connection with the funeral and his trip to Brownwood. Bond testified that, had he known it was a full release of the railway company from all liability, he would not have signed it. It is undisputed, however, that, after the claim agent had prepared the release in duplicate or triplicate, he handed Bond and his wife a copy and requested them to read it before they signed it. It is undisputed that both of them looked over the release before signing it, apparently reading it, and that they looked at it long enough to read it. Bond testified that he could not read it well without his glasses, which were in the house, they being on the front porch at the time, but that he did not get his glasses. There is no testimony that the claim agent made any statement at the time as to the contents of the release, or did anything to prevent them from reading it. On the contrary, the uncontroverted evidence shows that he requested them to read it, and that they undertook to do so. In addition, a blank line was left near the end of the instrument, and Bond was requested to write in, in his own handwriting, the words, "We understand this is a release." While Bond testified that he did not remember to have written in these words, he did not positively deny that he did so, and both the claim agent and the undertaker testified that he did so at the claim agent's request. The release contained the above language written with pen and ink just above the signatures of appellants. Both the son and daughter of appellants, who were present, testified that appellants looked over the instrument, apparently reading it, long enough to have done so. Bond testified upon cross-examination:

"Q. You tell the jury that you could not read this (meaning the release)? A. Not plain.

"Q. Did you try to read it? A. I did not try to read it carefully. I glanced over it.

"Q. Did you try to read this (meaning the release) or not before you signed it? A. I read it the best I could. I could not understand.

"Q. Did you have any glasses? A. I think probably I did. I did not go into the house after them. It is like I said I was not very interested.

"Q. You did not go after your glasses or call for them? A. No, I was not interested.

"Q. Tell the jury whether you read it (meaning the release)? A. I glanced over it.

"Q. What do you mean by that? A. I was not interested and I caught a few words as I glanced over it along. Not enough to amount to anything. I was not interested."

He also testified:

"Q. You stated if I recall on direct examination that you looked at that paper (meaning the release) for two or three minutes. What were you doing in that two or three minutes? A. Like I said I just slightly glanced over it.

"Q. Did you read any part of it? A. Not one whole line, no sir.

"Q. While you looked at it for two or three minutes, you did not read a single line? A. I do not think so.

"Q. What were you doing during that two or three minutes? A. I was not doing anything only spending a little time.

"Q. If your eyes were resting on it as much as two or three minutes, why didn't you read a single line? A. I did not have anything to do and just looked at it."

Under such facts and circumstances we think that appellants were clearly bound by said release and that there was no testimony to sustain the jury finding. It is well-settled law that such instruments may be set aside where procured by fraud, deceit, or misrepresentation, or where a fiduciary relationship exists and is taken advantage of by the opposite party, or where the parties have a right to repose special confidence in those inducing the contract and such confidence is abused to their injury. But no such case is here presented. There is no evidence that the claim agent made any misrepresentations to appellants at the time as to the contents or character of the release, nor that he did anything to prevent them from fully informing themselves of its contents. On the contrary, he requested that they read it, and they undertook to do so. Even if it be conceded that Bond did not fully understand the contents of such instrument, which concession does not comport with the facts and circumstances, his failure to do so must be ascribed to his own carelessness. There was no mutual mistake as to its contents and no evidence of fraud or misrepresentation as to its contents. Under such circumstances, he cannot avoid it on the ground that he did not understand it or know its full import, even if his ignorance of its provisions could be conceded, which, as stated, under the undisputed facts is very doubtful. Williams v. Rand, 9 Tex. Civ. App.

631, 30 S. W. 509; Conn v. Hagan, 93 Tex. 338, 55 S. W. 323; M., K. & T. Ry. Co. v. Craig, 44 Tex. Civ. App. 583, 98 S. W. 907; National Un. Fire Ins. Co. v. Peck (Tex. Civ. App.) 296 S. W. 338; 10 Tex. Jur. 98, § 57, and numerous cases there cited.

Having concluded that appellants showed no grounds for setting aside said release, it is unnecessary to discuss the issues of negligence. The judgment of the trial court is therefore affirmed.

Affirmed.